2026 IL App (1st) 260840-U

FIRST DIVISION
July 27, 2026

No. 1-26-0840B

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee | ) ) | Cook County. |
| v. | ) ) | No. 26 MC 2001657 |
| OLEKSIY TSYAPALO, | ) ) | Honorable Anthony John Calabrese, |
| Defendant-Appellant. | ) ) ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the circuit court's order denying the defendant's motion for relief and continue his pretrial detention where the State established by clear and convincing evidence that the proof was evident and the presumption great that the defendant committed a hate crime, posed a real and present safety threat to the victim, and no condition or combination of conditions could mitigate that threat.

¶ 2    The defendant, Oleksiy Tsyapalo, appeals from the circuit court's April 11, 14, and 29,

2026 orders, directing that he be detained pretrial pursuant to section 110-6.1 of the Code of Criminal Procedure of 1963 (Code) (Pub. Act 104-417, § 1075 (eff. Aug. 15, 2025) (amending 725 ILCS 5/110-6.1)), commonly known as the Pretrial Fairness Act. On appeal, the defendant challenges his pretrial detention arguing that the State failed to present by clear and convincing evidence that: (1) the proof was evident or the presumption great that he committed a hate crime (720 ILCS 5/12-7.1-A (West 2024)); (2) he posed a real and present threat to the safety of the victim and the community; and (3) no less restrictive conditions could mitigate that threat. For the following reasons, we affirm.

¶ 3                                    II. BACKGOUND

¶ 4      The defendant was arrested on April 10, 2026, and charged with, *inter alia*, two Class 4 offenses: a hate crime (720 ILCS 5/12-7.1-A (West 2024)) and harassment through electronic communications (720 ILCS 5/26.5-3-A-5 (West 2024)).

¶ 5      On the following day, the State filed a petition seeking the defendant's pretrial detention and the court held a detention hearing. At that hearing, the judge initially asked for information regarding the defendant's pretrial supervision assessment (PSA), and the pretrial officer responded: "New criminal activity, 1; failure to appear, 1; PSA coincides with monitoring."

¶ 6      The State then argued that the proof was evident and the presumption great that the defendant committed a detainable offense, to wit, a hate crime (720 ILCS 5/12-7.1-A (West 2024)). The State proffered that between 2016 and 2020, the victim, who is an attorney and realtor, employed the defendant as a real estate agent. The employment relationship ended amicably. The victim retained the defendant's contact information, but did not hear from the defendant until 2024, when the defendant began calling and leaving him strange messages. The victim blocked the defendant's phone number and did not hear from the defendant again until January 17, 2026.

¶ 7    On January 17, 30, and 31, 2026, and February 1, 2026, the defendant repeatedly called the victim and left voicemails that were "violent in nature." On February 2, 2026, the victim made a police report about the phone calls and voicemails to the Northbrook Police Department. The defendant apologized to the victim and the victim declined to press charges based on the defendant's assurances that he would stop harassing him.

¶ 8    On March 27, 2026, the defendant, now using social media, again sent the victim numerous incoherent and rambling messages. The messages were sent from an Instagram account with the defendant's first and last name and the words "Luxury Lux Living." According to the State's proffer, in the messages the defendant threatened to harm the victim, noted the victim's work address, made references to human trafficking and used derogatory terms such as "dirty Jew," and the " 'N' word." On March 30, 2026, the victim emailed the Northbrook Police Department alerting them to the defendant's threats.

¶ 9    A week later, on April 7, 2026, the defendant again contacted the victim. First, at approximately 10:53 a.m. the defendant left the following voicemail on the defendant's cell phone:

> "I'm f***ing last warning, motherf***er. This is last f***ing warning before I come there and kill your dumb a**. I'm going f***ing pull up over there and I'm f***ing going to kill you."

Later that day, at approximately 12:12 p.m., the defendant left another voicemail in which he asked the victim, "where is my money b**ch," and referred to the victim as a "dirty Jew." Later that evening, the defendant sent the victim a series of emails from his Gmail account threatening to kill him and again referring to him as a "dirty Jew." Specifically, the defendant wrote, "I'm going to make a career of taking your dirty, Jewish, loser-self down, and I can kill you." The defendant then stated, "I am ready to kill you." In another message, the defendant wrote "This is the last f***ing

warning before I f***ing come there and kill your dumb a**. I'm going to f***ing up over there and I'm f***ing going to kill you, dude."

¶ 10    According to the State's proffer, on April 10, 2026, the defendant turned himself over to the Northbrook Police Department. After he was given *Miranda* warnings, the defendant admitted to making threatening voicemails to the victim in February 2026. He acknowledged that the voicemails came from his phone, that he is the only one who uses it, and that he left the messages. The defendant also acknowledged ownership of the Instagram handle and Gmail account from which the victim was sent threatening messages and stated that he was the sole user. The defendant further admitted that he sent "aggressive" and "heat of the moment, dark stuff" to the victim but described his actions as "just a phase." The defendant also acknowledged leaving death threats on the victim's voicemail but denied he was trying to kill the victim. Instead, the defendant explained away his conduct as "doing exactly what the media was designed for."

¶ 11    After the proffer, the State informed the court that the defendant had no prior criminal history and that this was his first arrest.

¶ 12    The State then argued that the proof was evident and presumption great that the defendant committed a hate crime when he repeatedly threatened the victim's life and safety, while using antisemitic slurs. The State further argued that the defendant posed a real and present threat to the safety of the victim and the Jewish community. In this respect, the State pointed out that the defendant was not making threats in the abstract but "giving a time" frame, providing the victim's address, and indicating he was going to "come over there," and "make a career out of taking [the victim] [a] dirty Jewish loser-self down." The State further argued that detention was the only way to safeguard against the defendant's continuing threats to the victim and that no condition or combination of conditions could mitigate that threat. Specifically, the State pointed out that the

defendant had once already promised to stop his behavior, and the victim, believing him, chose not to press charges. However, instead of honoring his promise, the defendant had continued to threaten the victim using derogatory and antisemitic language.

¶ 13    In response, defense counsel first argued that the State had failed to establish that the proof was evident or the presumption great that the defendant committed a hate crime. According to counsel, even though the defendant had used derogatory language, "the allegation [was] that this was over some sort of money and that that was actually the motivating factor and not that [the victim] was Jewish." Defense counsel further argued that the defendant did not pose a threat to either the victim or to the Jewish community because he had no prior criminal record and there were no allegations whatsoever that he had ever been violent with anyone. Defense counsel noted that, "as a Jewish man, standing right next to him, I do not feel any threat from my client." In addition, in mitigation, counsel pointed out that the defendant was a 34-year-old, life-long resident of Cook County, who had been employed as an Uber and Lyft driver for the past several years. The defendant lived in Streamwood, which was not near Northbrook, where the victim resided. Moreover, the defendant had acknowledged that the emails he sent were scary and understood that they were inappropriate. Defense counsel therefore argued that detaining defendant would serve no beneficial purpose, and that instead pretrial release conditions requiring the defendant not to use social media would be sufficient to deter any safety threats and send the defendant "a strong message."

¶ 14    In rebuttal, the State argued that despite the victim's attempts to block the defendant's phone number, the defendant had found other means (email and social media) by which to actively continue to seek out and threaten him. Accordingly, electronic monitoring, which, by its very nature, was "reactive" could not mitigate the risk of harm posed by the defendant as it would not

stop him from communicating with the victim or driving to Northbrook to find him at his office or home.

¶ 15    After hearing the parties' arguments, the circuit court granted the State's petition to detain the defendant. In doing so, the court first found that the State proved by clear and convincing evidence that the proof was evident that the defendant had committed the eligible detainable offense—a  hate crime. The court observed that between 2024 and 2026, the defendant, who had previously worked for the victim, sent the victim derogatory, hateful and harassing messages by telephone, email and social media, *inter alia*, calling him a "dirty Jew," threatening his life, and advertising his work address. The court further noted that upon his arrest, the defendant admitted to owning the telephone, email and Instagram accounts from which the messages were sent but dismissed his conduct as a "phase" and "what the media was designed for."

¶ 16    The circuit court next found that the defendant posed a real and present threat to the safety of the victim and the community. The court noted that the defendant and the victim knew each other well and that "there [wa]s some sort of" ongoing issue between them that would "come out later at trial." The court acknowledged that the defendant's exact motive was unclear but held that at this juncture it was evident that "it was and is a motive for the defendant" to harass and threaten the victim repeatedly using derogatory terminology to reference his Jewish descent. The court further noted that the threats had recently escalated and that the defendant had posted the victim's address on social media, "creating a hostile environment for others to join."

¶ 17    The circuit court next found that there was no condition or combination of conditions beyond detention that could mitigate the defendant's real and present threat to the victim or the community. The court held that electronic monitoring, home confinement, or GPS would not deter the defendant from harming the victim or committing new offenses. In doing so, the court found

relevant that the defendant had threatened to kill the victim using electronic means, and that he had justified his behavior as reflective of "what the media was designed for." The court explained that because electronic monitoring, home confinement, and GPS do not control phone or internet usage, they would not curtail the defendant from using his laptop or phone to continue to harass the victim, even if he were ordered not to do so. Most importantly, the court found that detention was necessary because the defendant had repeatedly threatened to kill the victim.

¶ 18    At the next, April 14, 2026, court hearing, held before a different judge, private counsel appeared for the defendant, informed the court that he had additional information, and requested to make an informal argument requesting the defendant's immediate release from pretrial detention. Counsel then proffered that the 34-year-old defendant was a naturalized American citizen, who had been born in Ukraine, but had lived in the United States since he was eight years old. According to counsel, the defendant presently resided with his mother and father and had never previously been in trouble with the law. Furthermore, the defendant's mother, with whom counsel had recently spoken, had assured him that should the defendant be released from custody and placed on electronic monitoring, home confinement or GPS, she would guarantee that he had no access to any electronic communication devices or other means by which to communicate with the victim in this case.

¶ 19    After reviewing the original pretrial detention order, the judge ordered that the defendant remain in pretrial custody. In doing so, the judge explained that without a transcript from the original detention hearing, he did not know whether the mitigating evidence offered by private counsel had previously been considered but that looking "at the entirety of the matter," and the detention judge's prior written ruling, "it certainly seem[ed]" that "the defendant [wa]s lawfully detained and the detention should stand."

¶ 20    On April 23, 2026, defense counsel formally filed a motion for relief pursuant to section 110-6.1 of the Act (725 ILCS 5/110-6.1 (West 2024)) challenging the defendant's pretrial detention. On April 29, 2026, the circuit court held a hearing on that motion. There, defense counsel argued that the circuit court erred when it found that the State failed to show by clear and convincing evidence that the proof was evident or presumption great that the defendant committed a hate crime. According to defense counsel, to establish a hate crime the circuit court needed to find that the defendant's derogatory messages were, at least in part, motivated by his animosity toward the victim's Jewish religion and/or background. However, because the circuit court explicitly refused to find what motivated the defendant's conduct, reserving this issue for trial, defense counsel argued that the State had failed in its burden to show that the defendant committed that detainable offense. In addition, defense counsel argued that the State's own proffer established that the defendant was not motivated by antisemitism but rather by the fact that the victim  had owed him money. Specifically, defense counsel pointed out that according to the State's own proffer, the defendant, who had once been employed by the victim, sent the victim a message asking him,  "Where's my money b\*\*ch?" Defense counsel also argued that in finding that pretrial release would pose a safety threat to the victim, the circuit court had ignored all the mitigating evidence, including the defendant's age, gainful employment, community ties, lack of prior criminal history or violence, low pretrial assessment scores and recommendation for monitoring. Finally, defense counsel asserted that in determining that there were no conditions of release that could mitigate the defendant's threat, the circuit court had failed to fully consider all available options at its disposal, including that the defendant's devices be installed with software monitoring his internet usage, which have previously been used by the court in its Sex Offender Program. According to defense counsel, installing such software on the defendant's devices would mitigate

any threat he posed to the victim and the community.

¶ 21    In response, the State largely reiterated the arguments it had made at the original detention hearing. The State further argued that when the defendant's repeated threats, references to the victim as a "dirty Jew," and justifications for his conduct, were considered in the context of how the media was presently treating the Jewish community, there was no question that the defendant had committed a hate crime. The State further reiterated that the defendant posed a safety threat because his threats to kill the victim were not an isolated event but rather spanned over several years.

¶ 22    After hearing the parties' arguments, the circuit court upheld the original detention order. In doing so, the court differentiated the instant case from a situation involving an argument over a parking spot where one individual uses a racial epithet against another one, but "they're really fighting about the parking space." The court noted that the circumstances here were different because this was an "ongoing simmering situation" that lasted "for a long period of time," during which the defendant continued "again and again" to threaten the victim, sometimes with death, repeatedly "intertwin[ing] [those threats] with racial epithets against the victim, specifically, the phrase, "dirty Jew[.]'" The court reiterated that the threats were all related to who the victim was by virtue of his religion and that the evidence regarding the commission of the crime was therefore "extraordinarily strong," and the danger posed by the defendant to the community "abundantly clear." The court further remarked on the many attempts by the victim to stop the defendant from harassing and threatening him, including blocking his calls, and reporting his harassment to the police. The court therefore held that in light of the defendant's "absolute determination" to continue to attack the victim, his repeated threats to kill the victim, and his hateful rhetoric against the victim's Jewish faith even after the victim went to the police, there were no conditions of

release that could protect the victim from further ongoing attacks. Accordingly, the court held that the defendant should remain in pretrial detention

¶ 23　　On May 5, 2026, the defendant filed a notice of appeal challenging the circuit court's detention orders. On June 18, 2026, the defendant filed a notice in lieu of a 604(h) memorandum.[1] The State filed its Appellee Memorandum on July 8, 2026. This appeal follows.

¶ 24　　　　　　　　　　　　　　II. ANALYSIS

¶ 25　　Under the Pretrial Fairness Act, all criminal defendants are presumed eligible for pretrial release. 725 ILCS 5/110-6.1(e) (West 2024). That presumption is overcome only if the State can prove by clear and convincing evidence that: (1) the proof is evident or the presumption great that the defendant committed a detainable offense; (2) the defendant poses a real and present threat to the safety of any person or the community based on specific, articulable facts of the case; and (3) no condition or combination of conditions of pretrial release can mitigate that threat. *Id*. Clear and convincing evidence is " 'that quantum of proof that leaves no reasonable doubt in the mind of the fact finder about the truth of the proposition in question.' [Citation.]" *People v. Williams*, 2024 IL App (1st) 240341-U, ¶ 13.

¶ 26　　Where, as here, the underlying detention hearing did not involve any live witness testimony, we review the circuit court's detention decision *de novo*. See *People v. Morgan*, 2025 IL 130626. As such, we are "not bound by the circuit court's factual findings and may *** conduct [our] own independent *de novo* review of the proffered evidence and evidence otherwise documentary in nature." *Id.*

---

[1]See Ill. S. Ct. R. 604(h)(7) (eff. Apr. 15, 2024) (the motion for relief will serve as the appellant's argument on appeal, and an appellant may, but is not required to, file an additional memorandum in support).

¶ 27    As already noted above, in the present case, instead of an appellate brief, the defendant has filed a notice in lieu of his Rule 604(h) memorandum stating his intention to rely solely on the arguments raised in his motion for relief before the circuit court. As such, we will review the arguments raised therein.

¶ 28                              A. Detainable Offense

¶ 29    In his motion for relief, the defendant first argues that the State failed to establish by clear and convincing evidence that he had the requisite intent for a hate crime, *i.e.*, that his conduct was motivated by antisemitism. In this respect, the defendant asserts that the State's own proffer established that his true motive was money, and that the circuit court itself reserved this issue for trial. Under this record, he argues that the State failed in its burden to show that the proof was evident or the presumption great that he committed a detainable offense. We disagree.

¶ 30    The Illinois hate crime statute explicitly provides that "[a] person commits a hate crime when by reason of the actual or perceived race, *** religion, ancestry, *** or national origin of another individual or group of individuals, *regardless of the existence of any other motivating factors*, he or she commits *** harassment by telephone, or harassment through electronic communications as these crimes are defined in *** this Code." (Emphasis added.) 720 ILCS 5/12-7.1 (West 2024). Harassment by telephone is defined, *inter alia*, as "us[ing] telephone communication" to "mak[e] a telephone call, whether or not conversation ensues, with intent to abuse, threaten or harass any person at the called number." 720 ILCS 5/26.5-2(5) (West 2024). Harassment through electronic communications is defined, *inter alia*, as "us[ing] electronic communication" to "threaten[] injury to the person or to the property of the person to whom an electronic communication is directed." 720 ILCS 5/26.5-3(5) (West 2024).

¶ 31    Under the plain language of the statute, it is apparent to succeed in its burden of showing that the proof was evident or the presumption great that the defendant committed a hate crime, the State was not required to show that the defendant's conduct was solely motivated by his animosity toward the victim's Jewish religion and/or background. Instead, all the State was required to show was that the defendant's conduct, *i.e.,* his abuse, and threats of injury to the victim, by way of telephone or electronic communications, at least in part, stemmed from some such animus (real or perceived).

¶ 32    The State's proffer did just that. Specifically, the State proffered that over a span of two years, the defendant repeatedly contacted the victim by way of telephone, email and social media, abusing him, harassing him, and threatening to kill him, all the while continually using antisemitic slurs and referring to him as a "dirty Jew." More recently, the defendant also posted the victim's work address on social media, inviting others to join in his harassment. What is more, upon his arrest, the defendant admitted to sending such harassing messages and owning the devices and social media accounts from which these communications were sent. Under this record, we are compelled to conclude that regardless of any other motives the defendant may have had, his admission to repeatedly using antisemitic slurs while threatening to injure and kill the victim, and subsequently posting the victim's address online, were more than sufficient for the State to establish by clear and convincing evidence that the proof was evident or the presumption great that the defendant's conduct rose to the level of a hate crime. See *e.g.*, *People v. Militelo*, 2020 IL App (2d) 190486-U, ¶ 11 ("[a]s long as [religion, ancestry or national origin] is one of the motivating factors for defendant's actions, a defendant's conviction for a hate crime may stand"); *People v. Vladimir P.,* 283 Ill. App. 3d 1068, 1073-74, 1077 (1996) (explaining that the requisite intent for a hate crime can be established by way of circumstantial evidence and holding that the evidence

was sufficient to show the defendant committed a hate crime where his attack on the victim included explicit antisemitic slurs, even though some evidence suggested that he committed the crime because he was bored).

¶ 33                              B. Threat to Victim or Community

¶ 34    The defendant next asserts that the circuit court erred when it found that he posed a real and present threat to the safety of the victim and the community. Specifically, the defendant complains that the court failed to consider any of the mitigating circumstances, including his age, steady employment, ties to the community, no prior criminal history or evidence of violence, low pretrial services scores and recommendation for monitoring. According to the defendant, given the "significant nature" of these mitigating factors, the court's "omission of any discussion of them" shows that its finding was made in error. We disagree.

¶ 35    The Act provides a non-exhaustive list of factors that the circuit court may consider in assessing the defendant's "dangerousness," including, *inter alia*: the nature and circumstances of the offense; the defendant's history and characteristics; the identity of any person or persons to whose safety the defendant is believed to pose a threat; the nature of the threat; any statements made by the defendant; and any other factors with a reasonable bearing on the defendant's propensity for, violent, abusive or assaultive behavior. See 725 ILCS 5/110-6.1(g) (West 2022).

¶ 36    The record demonstrates that the circuit court considered these factors, and correctly found that despite the mitigating evidence, the defendant posed a real and present threat to the safety of the victim. To that point, the record reveals that the nature and circumstances of the offense were callous and recurrent. Specifically, over a period of two years, the defendant continued to bombard the victim with death threats, interspersed with antisemitic epithets. Moreover, the defendant demonstrated an inability to control his behavior even after police intervention. In fact, he

subsequently escalated the threats by publicizing the victim's work address in conjunction with similar epithets on social media, thereby inviting others to join in his harassment and abuse of the victim. Moreover, in his last slew of messages to the victim on April 7, 2026, the defendant, knowing the victim's address, repeatedly threatened that this was the victim's "last warning" and that he was about to "come over there" and "kill him." Given the defendant's lack of self-control, his reckless disregard for the victim's privacy, his repeated use of antisemitic slurs, and the escalation of his death threats to the victim, we find nothing erroneous in the circuit court's conclusion that the defendant posed a real and present safety threat to the victim.

¶ 37    Contrary to the defendant's position, the fact that the circuit court focused on the nature and circumstances of the crime in finding the defendant was dangerous does not equate to the court ignoring that this was his first offense. The court was well-aware that the defendant had no prior criminal record as it repeatedly stated that the defendant had avoided prior arrest because the victim previously chose not to press charges. Nonetheless, the court found that the defendant's sustained harassment evinced his intent to continue targeting the victim. "The presumption in favor of pretrial release under the Act does not obligate a trial court to release such a defendant in the hopes that his otherwise spotless record will negate the real and present threat" he poses as evinced by the State's evidence. *People v. Romine*, 2024 IL App (4th) 240321, ¶ 20. "To conclude otherwise would mean that a true first offender—regardless of how heinous the offense charged or the obvious danger presented—could *never* be detained pretrial, because in such a case, the only evidence available would consist of the nature and circumstances of the crime charged." (Emphasis in original.) *People v. Carpenter*, 2024 IL App (1st) 240037, ¶ 15. As we have repeatedly held "there is nothing in the text of the Code to suggest that the General Assembly intended such an absurd result." *Id*.

- 14 -

¶ 38                     C. Conditions of Release

¶ 39     Finally, the defendant argues there were conditions of release that could have mitigated his safety threat to the victim and the public, namely the installation of software, already used in the court's Sex Offender Program, on his devices to monitor and control his online conduct. The defendant asserts that when combined with physical monitoring (*i.e.*, home confinement with electronic monitoring), this software would sufficiently safeguard the victim from any further threats. Again, we disagree.

¶ 40     In determining whether pretrial release conditions would reasonably ensure the safety of the victim or the public, courts must consider "the *likelihood* of compliance by the defendant with all conditions of pretrial release." (Emphasis added.) 725 ILCS 5/110-5(a)(3)(A)-(B) (West 2022). Section 110-5 of the Act lists the factors that the circuit court may consider in making this determination. 725 ILCS 5/110-5 (West 2022). These factors mirror those the court can consider in determining the defendant's "dangerousness," and include, *inter alia*: the nature and circumstances of the charged offenses; the weight of the evidence against the defendant; and the nature and seriousness of the safety threat that would be posed by the defendant's release. 725 ILCS 5/110-5(a)(1), (2), (4) (West 2022); *People v. Saucedo*, 2024 IL App (1st) 232020, ¶ 49; *People v. Jones*, 2023 IL App (4th) 230837, ¶ 32; *People v. Reed*, 2023 IL App (1st) 231834, ¶ 31.

¶ 41     Here, the factors weigh heavily against the defendant's release. The persistent nature of the defendant's threats to the victim and their escalation even after police involvement undermine any confidence that the defendant would comply with the suggested conditions of release and refrain from targeting the victim again. In the past, each time the victim attempted to avoid harassment by the defendant (by blocking his phone number and reporting him to the police), the defendant found new means by which to continue his hateful and threatening campaign (email and social media).

The defendant's callous justifications of his publication of the victim's work address on an online public platform as "what the media was designed for" further support our conclusion. As things stand, where the defendant was already given notice that his conduct was criminal and that he needed to stop, but nonetheless continued to harass and threaten the victim using antisemitic slurs and implicitly inviting others with the same hateful views to join in, the threat of further abuse cannot be allayed by simply placing monitoring software on his devices while also curtailing his physical movements. Since home confinement and electronic monitoring would allow the defendant two days a week of unmonitored movement,[2] installing internet monitoring software on his devices would not deter him from obtaining and using another unmonitored device from which to continue his terror campaign. Nor would any of these conditions prevent the defendant from coming to the victim's home or office to realize his violent threats. Under this record, we find nothing erroneous in the circuit court's conclusion that no conditions of release could mitigate the defendant's threat to the victim and that therefore pretrial detention was proper.

¶ 42                                III. CONCLUSION

¶ 43    For these reasons, we affirm the judgment of the circuit court.

¶ 44    Affirmed.

---

[2] See 730 ILCS 5/5-8A-4, (A-1), (E)(1) (West 2024) ("At a minimum, any person ordered to pretrial home confinement with or without electronic monitoring must be provided with movement spread out over no fewer than two days per week, to participate in basic activities[.]")